**Anthony BRUNO, Jr., Plaintiff,**

v.

**UNITED STEELWORKERS OF AMERICA, et al., Defendant.**

**No. 91–CV–287.**

United States District Court, N.D. Ohio, E.D.

Jan. 29, 1992.

Barbara J. Angelo, Niles, Ohio, Jacklynn M. Zarnick, Canfield, Ohio, for plaintiff Anthony Bruno, Jr.

Mark A. Rock, Suellen Oswald, Schwarzwald, Robiner & Rock, Cleveland, Ohio, for defendant United Steelworkers of America.

Michael G. Marando, Hoppe, Frey, Hewitt & Milligan, Warren, Ohio, for defendant Amweld Bldg. Products, Inc.

## ORDER

SAM H. BELL, District Judge.

Currently pending before the court in the above-captioned matter are four motions for summary judgment. As the facts which have given rise to plaintiff's claims and defendants' contentions are intertwined so, too, are the elements of analysis which pertain to any ruling on the motions presented. It is the intention of this court to address each of the motions presented in a single opinion rather than in separate findings. To do so necessitates some reflection of precedent opinion and, as well, some quotation from the record. The readers' patience is requested in perusing a

combination ruling. It is hoped that such an opinion in form may be superior to four independent opinions with a necessary redundancy in fact and legal analysis.

Plaintiff filed his complaint in this cause on February 14, 1991. Count One of the complaint is premised upon an alleged breach of a collective bargaining agreement by plaintiff's employer, defendant Amweld Building Products, Inc. (Amweld), and upon breach of the duty of fair representation on the part of defendant United Steelworkers of America (the Union). Plaintiff seeks recovery under these theories pursuant to Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). Count Two alleges that Amweld failed to provide notice to plaintiff of continuation coverage under a health and pension plan in violation of the Consolidated Omnibus Budget Reconciliation Act of 1986 (COBRA), 29 U.S.C. § 1161 *et seq.*

On September 27, 1991, Amweld moved for summary judgment on Count Two of plaintiff's complaint. Plaintiff filed a cross motion for summary judgment as to the same count on November 1, 1991. On October 17, 1991, the Union filed a motion for summary judgment as to plaintiff's claim against it for breach of the duty of fair representation under Count One. Finally, on November 12, 1991, plaintiff filed a motion to vacate the arbitrator's opinion and award rendered on November 30, 1990; this motion is styled a "Motion for Summary Judgment on Request for Order Vacating Arbitrator's Award." All motions have been opposed by response briefs.

The court will proceed, first, with an analysis of the factual background as revealed by the evidence in the record submitted to date. In this portion of the order, we shall also include an examination of the arbitration decision itself. The court will then address each motion separately, beginning with plaintiff's motion to vacate the arbitrator's award, then the Union's motion for summary judgment, and finally the cross motions for summary judgment on Count Two.

## I. BACKGROUND

Plaintiff and the Union filed a total of four grievances against Amweld during the winter of 1990. The first, AWN–3–90, was filed with Amweld on January 29, 1990, and stems from at least two incidents involving one Tom Brest, Amweld's Production Superintendent, on January 26 and 29, 1990. It would appear that in late January Brest informed plaintiff that he was required to view a safety film along with other employees. Plaintiff disagreed, and the grievance complains that Brest threatened plaintiff with insubordination and that "the Union feels Brest is unstable and his attitude will lead to further unnecessary confrontations." Union's Exhibit B to Motion for Summary Judgment. Plaintiff and the Union demanded that Amweld post laws requiring the mandatory viewing of films and that Brest cease verbal abuse. *Id.* Amweld denied the grievance for the stated reason that it was not covered under the terms of the CBA. *Id.* This grievance was not pursued to arbitration and is not otherwise involved in the instant cause.

On February 2, 1990, Amweld issued plaintiff written notice of discipline stemming, *inter alia*, from the altercation between plaintiff and Brest. Brest called plaintiff and members of the local Union into his office and rendered the discipline in person, while also giving plaintiff a written "personal report." This personal report charged plaintiff with "egregious misconduct, loafing, being uncooperative and inattentive, misrepresentation, a pattern of blatant, insubordinate, disrespectful attitude and conduct towards Company supervision." Plaintiff's Deposition I at 57–58.[1] This personal report gave plaintiff a five-day suspension with intent to discharge, effective February 5 through 9. *Id.* February 2 fell on a Friday; February 5 on a Monday.

A grievance protesting this discipline was not filed immediately. Rather, suspension hearings were held on two separate days, February 9 and February 13, pursu-

---

**1.** "Plaintiff's Deposition I" refers to the deposition held on May 6, 1991, while "Plaintiff's Dep-
osition II" refers to the June 3, 1991 deposition of plaintiff.

ant to the collective bargaining agreement and at the request of plaintiff. Willie Hall, Union representative, attended these meetings on behalf of plaintiff and the Union. Plaintiff's Deposition I at 27. At the February 9 hearing, plaintiff was given an opportunity to set forth his version of what happened between him and Brest, *i.e.,* to state all facts which he believed to be relevant to the personal report. *Id.* at 78, 82–83. Plaintiff also gave his side of the story at the February 13 meeting. *Id.* at 83–84. Each hearing lasted approximately one and one half hours. *Id.* at 82.

At the hearing on February 13, plaintiff was presented with an offer of reinstatement by Amweld. Complaint at ¶ 26. This offer was in the form of a "Reinstate Agreement" and reads as follows:

> The parties agree that Tony Bruno's employment with Amweld Building Products would be reinstated based upon the following terms and conditions. This agreement is the result of the disciplinary action issued Feb. 2, 1990.
>
> The period from the date of Mr. Bruno's suspension to the date of reinstatement will be recorded as a disciplinary suspension.
>
> Reinstatement is without back pay or loss of seniority.
>
> Mr. Bruno acknowledges that his conduct was unacceptable and makes the commitment that he will take corrective action to ensure no future incidents of this nature will occur.
>
> It is understood that future violations of this nature by Mr. Bruno will result in further disciplinary action up to and including termination of employment.
>
> Mr. Bruno and the Union agree to forego the filing of grievances and/or other claims which have or may be made as a result of this issue.
>
> This settlement is made without precedence or prejudice to the Company and Union in any other disciplinary cases.

*Id.,* Exhibit 4.[2] This offer was not accepted. Rather, on February 15, the Union filed plaintiff's second grievance, AWN–7–90, protesting as follows:

> The Union contests Anthony Bruno's Feb. 2, 1990 five day suspension, extended into a ten day suspension by the Company as premeditated and discriminatory, as the alleged charges are unjustified.

Exhibit E to Motion for Summary Judgment. Thus, this grievance, in reality, complained of two events: the February 2 suspension itself, and the extension of that suspension from five days to ten days. On February 16, plaintiff received a letter from Amweld which the latter characterized as a "response to the suspension hearing." Exhibit 6 to complaint. The letter, dated February 15, included the following "Reinstatement Offer" which is substantially the same as that presented at the February 13 hearing.

> As a result of the suspension hearing on February 9 and 12, 1990, the Company hereby takes the following action.
>
> The disciplinary suspension of February 2, 1990 is established as a 10 working day suspension with a return to work day of Monday, February 19, 1990.
>
> The 10 working day suspension period will be without pay or loss of seniority.
>
> It should be understood by Mr. Bruno that future violations of this nature will result in further disciplinary action up to and including termination of employment.
>
> Mr. Bruno by his signature below, agrees to return to work as outlined above. He acknowledges his conduct was unacceptable and makes a commitment that he will take corrective actions to ensure no further incidents of this nature will occur.

Exhibit 7 to complaint. Plaintiff found this offer to be unacceptable and communicated this to Hall. Plaintiff's Deposition I at 104.

A "Step Three"[3] meeting was held with regard to grievance AWN–7–90 on Febru-

---

**2.** Two versions of the agreement were presented. The second characterizes the terms and conditions as "last chance." Exhibit 4 to complaint.

**3.** The grievance process usually comprises four steps; the filing of the grievance comprises step one while arbitration itself represents step four. Plaintiff's Deposition I at 26.

ary 23, 1990. Plaintiff, Hall, and several local Union representatives were present at this meeting. Plaintiff's Deposition at 123. Once again, the confrontations between plaintiff and Brest occurring on January 26 and 29 were discussed. *Id.* Amweld, through one Glennard Pelphrey (Director of Industrial Relations), did not allow witnesses to come in and testify as to this subject. *Id.* at 124. Plaintiff does not recall discussing Amweld's reinstatement offer. *Id.* at 125. Rather, he and the Union representative "wanted retraction of the personal report, we wanted discrimination stopped, we wanted full compensation for time lost." *Id.*

On February 28, 1990, Amweld denied grievance AWN-7-90. Along with a letter received by plaintiff on March 1 (complaint at ¶ 33), Amweld included this denial and characterized the events which transpired on January 26 and 29 as follows:

Mr. Bruno's actions on Friday, 1/26/90, and Monday, 1/29/90, were deliberate, intentional acts of insubordination and egregious misconduct which *were serious* and warranted the disciplinary action in question. Mr. Bruno specifically failed to attend required safety instructional meetings on two occasions on Friday, 1/26/90, lied to his supervisor concerning his attendance and was loafing while he should have been attending the training session. On Monday, 1/29/90, in a confrontation with the Production Superintendent, Mr. Bruno again displayed his defiant and uncooperative attitude when he was being instructed to attend the training session. He did attend the required meeting after being instructed to do so for the third time. During the training session on 1/29/90, Mr. Bruno was disruptive, defiant and refused to cooperate and participate in the program. His misconduct was observed by multiple individuals, both hourly and salary. Upon Mr. Bruno entering the session he stated in the presence of other employees—"Do I have to watch this shit?" He then proceeded to sit during the initial part of the training session with his face turned to the wall, refusing to watch the taped presentation.

Further, approximately half way through the presentation, Mr. Bruno turned his head to the T.V. screen and began to engage in disruptive conversation with other employees to the extent that the presentation had to be stopped and Mr. Bruno warned to be quiet. It is clear from Mr. Bruno's disciplinary record, as well as his conduct on the dates in question, that the disciplinary suspension issued by the Company was for just cause.

Exhibit 8 to Complaint. In addition, in the letter plaintiff was instructed that, unless he returned to work within seven days "per the company's reinstatement letter of February 14, 1990," he would be terminated. Exhibit F to Motion for Summary Judgment. A copy of the February 14 reinstatement offer was attached to this letter. *Id.*

Plaintiff returned to work at 12:16 P.M. on March 1, 1990. Plaintiff's Deposition I at 132; complaint at ¶ 37. Plaintiff did not understand precisely the nature of the February 28 denial of grievance AWN-7-90, due to the fact that the accompanying letter instructed him to return to work. Plaintiff's Deposition I at 133–34. He thus returned to work, believing this the best course of action. *Id.* Immediately upon arriving upon Amweld's premises, he approached Brest with several Union representatives and informed Brest that he was prepared to resume working. Brest, however, would not allow this until plaintiff signed the reinstatement agreement. Plaintiff recounts his conversation with Brest in the following manner:

A. I returned to work and I called Dave Darbey, who was close, and asked him to get Rich Williamson and Bob Ulrich.
Q. All of those people were working at the time?
A. Yes.
Q. All right. Then what happened?
A. I said that I would like them to stay with me while I punched in my time card and asked Tom Brest to—to tell Tom Brest that I was here and ready to go to work. So, they came over and I punched in my time card. I asked Bob Ulrich to make me a copy of it, which he did.

Meanwhile, Tom Brest came up the aisle and I explained to him, I said, "Tom, I'm here and I am ready to go to work." He said, "Sign a reinstatement offer and you can go to work." I said, "Tom, I'm here to go to work." He said, "Sign the offer or go home." I asked him again, I said, "Tom, I'm here and I'm ready to go to work." He said, "Sign the offer or go home." And I went home. I left at that time.

Q. And why did you refuse to sign the offer?

A. The same reason I refused the first couple of times, it was unreasonable, I didn't really do anything. I thought that it's gone further than it should have gone. The third step answer should have been final. I should have been allowed to return to work and I wasn't.

*Id.* at 135–36.

On March 12, 1990, plaintiff and the Union filed their third grievance, AWN–17–90. This grievance protested Amweld's actions of March 1, *viz.*, not allowing plaintiff to return to work on that date unless he signed the reinstatement agreement. Grievance AWN–17–90 reads as follows:

The Union contests the co. actions, March 1, 1990, taken against Anthony Bruno, by instructing his return to work, then not allowing him to do so unless he signed the reinstatement offer. The Union will not tolerate forcing an employee to perjure himself by signing an offer containing false and harmful statements and conditions in the attempt to circumvent the agreement and other employee rights. This deliberate, discriminatory action against Mr. Bruno, and the attempt at clouding and confusing the issue to do harm, is evidenced throughout, and the co. must cease and desist once and for all.

Exhibit G to Motion for Summary Judgment. Two days later, on March 14, Amweld terminated plaintiff by letter for his "refusal to return to work per the Company's letter of February 29, 1990" and his "previous disciplinary record." Exhibit H to Motion for Summary Judgment. The fourth grievance, AWN–18–90, was filed on March 15, and protested the March 14 termination. Exhibit I to Motion for Summary Judgment. This final grievance also charged that the March 14 discharge was untimely. *Id.*

A Step Three grievance meeting was held on March 29, 1990 concerning grievances AWN–17–90 and AWN–18–90. The parties were unable to resolve any of their differences at this meeting. Plaintiff's Deposition I at 158. However, on April 9, 1990, Amweld issued their Step Three answer to grievances AWN–17–90 and AWN–18–90, and in this answer again offered plaintiff an opportunity to return to work if he complied with the terms of the reinstatement agreement. The pertinent portion of the Step Three answer reads as follows:

While the Company maintains its actions in this case have been for just cause, the Company, in consideration of Mr. Bruno's many years of service, is willing to provide the grievant with one *last* opportunity to return to work as follows. The period from February 2, 1990 to day of return to work will be considered as a disciplinary suspension without pay. Mr. Bruno by his return to work acknowledges his conduct has been unacceptable and makes a commitment to take corrective action to ensure no further incidents of this nature will occur, with it being understood that subsequent violations of this nature will result in disciplinary action up to and including termination of employment. This *last* opportunity will only be available until Monday, April 16, 1990.

Exhibit J to Motion for Summary Judgment. Plaintiff did not return to work by April 16, and Amweld thereafter labeled plaintiff's failure to return a voluntary resignation. April 20, 1990 letter to plaintiff from Pelphrey, Exhibit 15 complaint.

On July 26 and August 14, 1990, grievances AWN–7–90, AWN–17–90 and AWN–18–90 were arbitrated before one Nicholas Duda (the Arbitrator). On November 30, 1990, the Arbitrator issued his opinion and award. In this opinion, the Arbitrator initially stated the issues presented as follows: first, whether there was proper

cause to discharge plaintiff; second, whether Amweld discriminated against plaintiff because of his Union activity, his filing of grievances, or his oral complaints.

In making his findings of fact, the Arbitrator first noted that plaintiff had been suspended by Amweld from July 27, 1989 to August 1, 1989 for the following misconduct:

Gross insubordination, use of profane and abusive language toward Company representative, has been absent from work without just cause, failed to report, gross misconduct, repeatedly made false, malicious, inflammatory, defamatory, and slanderous statements and allegations about and against the Company and management representatives.

Arbitrator's Opinion at 12. Then, the Arbitrator detailed the misconduct allegedly undertaken by plaintiff on January 26 and 29, 1990. The Arbitrator, initially, stated his Opinion that Amweld's witnesses were credible, while the Union's were not. With regard to the latter testimony, the Arbitrator commented as follows:

The Company witnesses were accurate and without bias; they were creditable and persuasive. The same cannot be said about the Union witnesses. The Arbitrator notes that some of the Union testimony very closely matched detailed notes which the witnesses claimed to have written many months before, suggesting that the information had been recently memorized. Furthermore, the language used on the notes and in testimony by some witnesses was different than that used by the same witnesses in other statements. Also, the testimony between different witnesses, who had been separated was almost identical in vocabulary, verbs, tense, adjectives, etc. The events raised a suspicion that the witnesses were following a "script" written by someone other than the witnesses. Even if the Arbitrator had not suspected that someone had orchestrated the testimony, he did not find it sufficient to destroy or even significantly harm the overall effect of the testimony by the Company, if only because Grievant admitted much of the Company's version, particularly about his conduct on January 26, 1990. Of course he claimed innocent misunderstanding or confusion. If the claim of miscommunication had been asserted by an inexperienced employee who did not also commit the other proved acts and did not have a disciplinary record of the type possessed by Grievant, the claim would be entitled to serious consideration. Given the specifics of the admitted communication, other proved items and Grievant's long experience and history, his claim of innocence in respect to the facts he admits is highly implausible.

*Id.* at 12–13.

As to the events which occurred on January 26 and 29, the Arbitrator first found that Amweld required employees to view a chemical safety film because it, the employer, had been notified by the Department of Labor that it was in violation of Occupational Safety and Health Administration regulations and because the collective bargaining agreement required it to inform employees of such safety hazards. *Id.* at 13–14. Two sessions of the film were held on January 26. *Id.* On January 26, plaintiff's supervisor, one Foriska, notified plaintiff and another employee, one Maxwell, that they were to attend that day's session, but Foriska was told by these men that they had attended an earlier session. *Id.* Foriska later found out through one Pam Mealy, who conducted the January 24 sessions, that these men had in reality not attended on that day. *Id.* Foriska then returned to plaintiff and Maxwell and instructed them to attend the January 26 film session. *Id.*

The Arbitrator found that neither plaintiff nor Maxwell attended the January 26 session. Plaintiff was approached about this on January 29, and the Arbitrator relates what happened next:

On Monday, January 29, 1990, the Company, in reviewing the training session attendance records, found that the Grievant and Maxwell had not attended any session. Production Superintendent Tom Brest, questioned Supervisor Foriska

concerning their failure to attend. Foriska related to Mr. Brest what had transpired on Friday, January 26, 1990. Superintendent Brest approached the Grievant concerning his failure to attend. Grievant questioned by whose authority did he have to attend. Mr. Brest instructed the Grievant that the Company was requiring his attendance to comply with OSHA and Labor Agreement requirements. At this point the Grievant unleashed verbal abuse on Brest calling him a "Hitler," a "Communist," and a "Nazi." On hearing these words from Grievant, Brest told Grievant that if he continued that behavior, disciplinary action similar to the discipline which had been issued to him in June 1989 would be forthcoming. Brest left saying he would be back with a specific make-up for Grievant.

After establishing a time for the makeup training session Brest returned to the Grievant accompanied by Supervisor Tom Marshal. Brest informed the Grievant of the session he was assigned to attend. Grievant again made a verbal attack on Superintendent Brest, questioning his authority to require him to attend any type of session. Again Mr. Brest instructed the Grievant he was required to attend Grievant stated he saw that Mr. Brest had brought along his spy (Mr. Marshall).

Brest told Maxwell to attend the same make-up session later that afternoon.

Grievant attended the make-up session. However, the Grievant displayed blatant misconduct during the session, failing to participate properly and instigating such disruptive conduct the session had to be stopped.

When Grievant entered the room, he asked Ms. Mealy, who was conducting the session, "Do I have to watch this piece of shit?" She told him he had to attend and asked him to sign the attendance sheet. He refused saying he would not "sign it against his will."

The Grievant sat with his face turned to the wall, instead of facing the video screen. While the film and audio played Grievant initiated disruptive conversation with other employees in the room. At that point, Ms. Mealy left the room to get assistance from other supervisory personnel. When management representatives came to the room, Grievant was still turned with his back to the film, talking with other employees. Operations Manager Paul Weymer, entered the room and turned off the film. He told the group the session was required and disruptions would not be tolerated. After a brief exchange between Grievant and Weymer, the session resumed. At the conclusion of the meeting, the Grievant was again asked to sign the attendance sheet. After holding the sheet for several minutes the Grievant scribbled something illegible across the signature line, it did not look like his handwriting or signature.

*Id.* at 15–16.

Due to plaintiff's stated misconduct on the days of January 26 and 29, as well as his disciplinary suspension of the previous summer, Amweld found proper cause for discharge, and thus issued the five day suspension with intent to discharge. *Id.* at 16–17. Maxwell was given a three day suspension. *Id.* The Arbitrator characterized the events which occurred thereafter from February 2 to April 20 in substantially the same manner as the record reveals in the case at bar, *see* discussion *supra* regarding plaintiff's grievances. *Id.* at 17–19.[4]

The Arbitrator found that Amweld's conduct throughout this period did not violate the terms of the collective bargaining agreement and that plaintiff had been discharged for just and proper cause, and that there occurred no timeliness or due process violations. *Id.* at 19–21. The Arbitrator also found no merit to the Union's claim of discriminatory treatment. *Id.* at 21–22. Neither did the Arbitrator find any evidence of retaliatory action on the part of

**4.** The only difference between the Arbitrator's version and the record in this case is that, according to the Arbitrator, the second hearing on the February 2 suspension occurred on February 12, rather than February 13, as plaintiff testifies.

Amweld for plaintiff's Union activity. *Id.* at 22. Finally, the Arbitrator concluded that, although "ordinarily discharge would be upheld with little further consideration, ... severe discipline short of discharge is appropriate and reasonable" in this case. *Id.* at 23. The Arbitrator found it reasonable to order plaintiff's reinstatement subject to the following conditions.

1. No later than December 14, 1990, Grievant may give Mr. Pelphrey a letter stating:

a. Grievant's willingness and desire to return to work;

b. and his agreement that such return is on a "last chance basis" so that any violation within the next two years of a Company rule or any of Grievant's responsibilities as an employee including any violation of the type committed on January 26 and 29, 1990 will subject him to suspension and discharge.

2. The Company may agree to such terms of reinstatement.

3. If grievant does return as provided in 1 and 2 above, the period of his absence will be deemed an extended suspension without pay and Grievant's seniority will be restored.

*Id.* at 24–25. Finally, the Arbitrator held that "[i]f the Grievant does not apply for reinstatement to employment as provided above, the subject suspension and discharge are found to be with just cause and the grievances are dismissed." *Id.* at 24.

While Count One of the complaint in this case alleges both breach of the collective bargaining agreement by Amweld and breach of the duty of fair representation by the Union, the court's remaining factual analysis will focus upon the latter allegation, which is the only one put to issue in the Union's motion for summary judgment. According to plaintiff, the following Union actions and/or failures to act during the course of the Union's representation of plaintiff amount to breach of the duty of fair representation:

1) The Union did not protest the untimeliness of the "personal report" issued to plaintiff by Amweld on February 2, 1990. Complaint at ¶ 17.

2) The Union did not protest Amweld's failure to give plaintiff a hearing prior to Amweld sending him home on February 2, which hearing is required under the collective bargaining agreement. *Id.* at ¶ 19.

3) After the February 9 and February 13 hearings regarding the February 2 suspension, Amweld did not render prompt notice of its disposition regarding its decision as required by the collective bargaining agreement, and the Union did not protest Amweld's untimeliness in failing to provide this prompt notice. *Id.* at ¶¶ 21–23.

4) The Union did not object to Amweld's failure to return plaintiff to work on February 12. *Id.* at ¶¶ 27, 30.

5) The Union failed to object to the reinstatement agreement presented to plaintiff on February 13. *Id.* at ¶ 27.

6) At the Step Three meeting of February 23, Amweld did not allow plaintiff to call witnesses or give evidential facts, and the Union did not protest Amweld's actions in this regard. *Id.* at ¶ 32.

7) The Union failed to protest Amweld's March 1 notice to plaintiff that unless he signed the reinstatement agreement and returned to work, he would be terminated. *Id.* at ¶ 36.

8) The Union did not protest when Amweld ordered plaintiff off of its premises on March 1 unless he signed the reinstatement agreement. *Id.* at ¶ 38.

9) The Union did not protest Amweld's failure to provide plaintiff a hearing prior to ordering him off of the premises on March 1. *Id.* at ¶ 40.

10) The Step Three meeting for grievances AWN–17–90 and AWN–18–90 held on March 29 was untimely under the collective bargaining agreement and the Union did not object to this untimeliness. *Id.* at ¶¶ 42, 46.

11) Amweld's Step Three answer to grievances AWN–17–90 and AWN–18–90, rendered on April 12, was not "final" and was not timely under the collective bargaining agreement, and the Union failed to object. *Id.* at ¶ 49.

12) To plaintiff's prejudice, the Union combined grievances AWN–7–90, AWN–17–90, and AWN–18–90 for purposes of arbitration. *Id.* at ¶ 51.

13) Over plaintiff's objections, the Union consented to have Duda hear the arbitration. *Id.* at ¶ 53.

14) The Union denied plaintiff's request to obtain his own counsel to represent him during the arbitration proceedings. *Id.* at ¶ 54.

15) The Union made no arrangement for the preservation of a transcript or other recording of the arbitration hearing. *Id.* at ¶ 56.

16) The Union did not object when the Arbitrator characterized all of plaintiff's grievances as "discharge" grievances. *Id.* at ¶ 57.

17) The Union representative, Hall, failed to meet with plaintiff's witnesses until immediately prior to the arbitration hearing. *Id.* at ¶ 58.

18) The Union failed to notify plaintiff's witnesses of the date and time of the arbitration hearing. *Id.* at ¶ 59.

19) The Union failed to raise objections to Amweld's untimeliness under the collective bargaining agreement, as previously alleged, during the arbitration hearing. *Id.* at ¶ 60.

20) The Union failed to object to Amweld's failure to provide suspension and discharge hearings during the arbitration hearing. *Id.* at ¶ 61.

21) During the arbitration hearing, the Union did not object to Amweld's discharge of plaintiff for reasons other than those given by Amweld. *Id.* at ¶ 62.

22) The Union did not object when the Arbitrator refused to permit plaintiff to speak, submit evidence, make objections, question witnesses, or otherwise participate in the arbitration proceedings. *Id.* at ¶ 63.

23) The Union did not object when the Arbitrator permitted Amweld's key witness to remain in the hearing room while ordering plaintiff's witnesses sequestered. *Id.* at ¶ 64.

24) The Union did not object when the Arbitrator attempted to intimate plaintiff into signing the reinstatement agreement prior to hearing plaintiff's witnesses. *Id.* at ¶ 65.

Plaintiff, finally, alleges that the above-described conduct on the part of the Union constituted gross negligence and bad faith representation in perfunctory, unreasonable, arbitrary, and discriminatory fashion. *Id.* at ¶¶ 67–69.

Before scrutinizing the above allegations as called for by the Union's motion for summary judgment, the court will first address plaintiff's motion to vacate the Arbitrator's decision.

## II. ANALYSIS

### A. *Plaintiff's Motion for Summary Judgment on Request for Order Vacating Arbitrator's Award*

Before the court can analyze the issues raised in the Union's motion for summary judgment, the court must, as an initial matter, address plaintiff's Motion for Summary Judgment on Request for Order Vacating the Arbitrator's Award (hereinafter plaintiff's motion). The procedural posture of this case, along with plaintiff's framing of the issue in his motion, necessitates this threshold inquiry.[5] In his motion, plaintiff contends that the Arbitrator's opinion and award must be vacated because it fails to draw its essence from the collective bargaining agreement.

The principle upon which plaintiff relies has its genesis in what has come to be referred to as the *Steelworkers Trilogy,*[6] which sets forth the standard to be utilized

---

**5.** As will be more fully discussed below, we will be required to revisit the issue of vacating the Arbitrator's award when addressing the Union's motion for summary judgment, *see* discussion *infra.*

**6.** The "Steelworkers Trilogy" is comprised of *United Steelworkers v. American Manufacturing*

*Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); and *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

by federal courts when reviewing labor arbitration decisions. Under this standard, district courts are to afford substantial deference to the arbitrator's decision. The court, in fact, is not permitted to overrule an arbitrator's decision even where that decision contains factual errors, except in two narrowly circumscribed instances:

> It is well settled that the courts are generally required to refrain from reviewing the merits of an arbitrator's award due to the policy favoring arbitration as a means of resolving labor disputes. This was established in the *Steelworkers Trilogy* and has been applied numerous times by this court. But there are at least two important exceptions to this general rule. First, "the arbitrator is confined to the interpretation and application of the collective bargaining agreement, and although he may construe ambiguous contract language, he is without authority to disregard or modify plain and unambiguous provisions." *Detroit Coil Co. v. Int'l Ass'n of Machinists*, 594 F.2d 575, 579 (6th Cir.1979), *citing cases.* Thus, the courts are empowered to set aside an award if the arbitrator exceeds these confines. Second, "although a court is precluded from overturning an award for errors in the determination of factual issues, '[n]evertheless, if an examination of the record before the arbitrator reveals no support whatever for his determinations, his award must be vacated.'" *Id.* at 580–81, *citing NF & M. Corp. v. United Steelworkers of America*, 524 F.2d 756, 760 (3d Cir.1975). *See also Timken Co. v. Local Union No. 1123 United Steelworkers of America*, 482 F.2d 1012, 1014–15 (6th Cir.1973).

*Storer Broadcasting Company v. American Federation of Television and Radio Artists, Cleveland Local, AFL–CIO*, 600 F.2d 45, 47 (6th Cir.1979) (footnotes omitted). This rule and the reasons underlying it have been stated even more strongly by the Supreme Court in *United Paperworkers International Union, AFL–CIO v. Misco, Inc.*, 484 U.S. 29, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987). In that case, the Supreme Court reiterated the standard for judicial review of arbitration awards as follows:

> The courts are not authorized to reconsider the merits of an award even though the parties may allege that the award rests on errors of fact or on misinterpretation of the contract. "The refusal of courts to review the merits of an arbitration award is the proper approach to arbitration under collective bargaining agreements. The federal policy of settling labor disputes by arbitration would be undermined if courts had the final say on the merits of the awards." *Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 596 4 L.Ed.2d 1424, 80 S.Ct. 1358 [1360] (1960). As long as the arbitrator's award "draws its essence from the collective bargaining agreement," and is not merely "his own brand of industrial justice," the award is legitimate. *Id.*, at 597, 4 L.Ed.2d 1424, 80 S.Ct. 1358 [1360].

. . . . .

> Because the parties have contracted to have disputes settled by an arbitrator chosen by them rather then by a judge, it is the arbitrator's view of the facts and of the meaning of the contract that they have agreed to accept. Courts thus do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts. To resolve disputes about the application of a collective-bargaining agreement, an arbitrator must find facts and a court may not reject those findings simply because it disagrees with them. The same is true of the arbitrator's interpretation of the contract. The arbitrator may not ignore the plain language of the contract; but the parties having authorized the arbitrator to give meaning to the language of the agreement, a court should not reject an award on the ground that the arbitrator misread the contract. *Enterprise Wheel, supra,* at 599, 4 L.Ed.2d 1424, 80 S.Ct. 1358 [1361]. So, too, where it is contemplated that the arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his

honest judgment in that respect.... [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced he committed serious error does not suffice to overturn his decision.

*Id.*, 484 U.S. at 36–38, 108 S.Ct. at 369–370. Moreover, "[t]his highly deferential standard of review is perhaps most commonly extended to the substantive issue of what constitutes sufficient and reasonable cause for discharge." *Interstate Brands Corporation, Butternut Bread Division v. Chauffeurs, Teamsters, Warehousemen and Helpers Local Union No. 135*, 909 F.2d 885, 889 (6th Cir.1990), *cert. denied* — U.S. ——, 111 S.Ct. 1104, 113 L.Ed.2d 214 (1991). Finally, " 'procedural' questions which grow out of the dispute and bear on its final disposition are the exclusive province of the arbitrator." *Id.* Thus, "an arbitrator's procedural rulings must not be disturbed by a court unless the arbitrator's error is 'in bad faith or so gross as to amount to affirmative misconduct.' " *Id.*, quoting *Misco*, 484 U.S. at 40, 108 S.Ct. at 371.

Plaintiff's argument that the Arbitrator's award fails to draw its essence from the collective bargaining agreement is based, first, upon the following proposition (plaintiff's motion at 3–11):

1) The Arbitrator failed to consider matters raised by grievance AWN–7–90 and ignored contractual provisions relevant to a decision on this grievance, *viz.:*

a) The Arbitrator ignored the provision of the agreement which requires Amweld to give prompt notice of the suspension prior to its occurrence (Article X, § 2);

b) The Arbitrator ignored the provision which requires Amweld to provide a hearing prior to the suspension (*Id.*);

c) The Arbitrator ignored the provision which requires Amweld to provide prompt notice of its disposition of the employee's case subsequent to a post-suspension hearing (*Id.*).

In sum, plaintiff maintains that these errors on the part of the Arbitrator were caused by the latter's disregard for the true nature of grievance AWN–7–90 as shown by his labeling Amweld's action a "discharge" rather than a "suspension." Due to this error, according to plaintiff, the Arbitrator failed to consider the relevant portions of the collective bargaining agreement which ensure the employee the procedural safeguards attendant to suspensions embodied in the collective bargaining agreement.

In the second part of his motion, plaintiff argues that the Arbitrator failed to consider the matters raised by grievances AWN–17–90 and AWN–18–90 (plaintiff's motion at 12–14). This argument amounts to the contention that the Arbitrator improperly characterized these grievances as objections to the discharge of plaintiff, when in reality plaintiff was protesting Amweld's attempt by means of the reinstatement offer "to force plaintiff to abandon his contractual right to appeal his suspension grievance through the arbitration process," which attempt "is a working condition not contemplated by the collective bargaining agreement." *Id.* at 12.

A review of the Arbitrator's decision establishes that, with regard to plaintiff's first proposition (that regarding grievance AWN–7–90), the Arbitrator did not ignore the contractual provisions relied upon by plaintiff. The Arbitrator did, in fact, cite and discuss Article X, § 2 of the collective bargaining agreement. The Arbitrator held that Amweld conducted a pre-suspension hearing on February 2. Arbitrator's Opinion at 16. The Arbitrator also found that the presentation of the reinstatement offer to plaintiff on February 12 [7] amounted to a prompt disposition of plaintiff's case subsequent to the post-termination hearing and that this satisfied the requirements of Article X, § 2. Finally, the Arbitrator concluded that plaintiff, in sum, was treated properly pursuant to this portion of the collective bargaining agreement.

At the suspension hearing on February 12, Mr. Pelphrey said Grievant would be

---

**7.** Plaintiff contends that this hearing concluded

on February 13. *See* note 3 *supra.*

discharged unless he agreed to the terms that would be sent to him. *That satisfied the requirements of Section 2 of Article X.*

Despite the explanation by the Company of its offer, Grievant mischaracterized the "Reinstatement Offer" to be a unilateral reduction from discharge to ten day suspension and made it the subject of Grievance 7–90. The documents which Grievant considered a ten day suspension was a "reinstatement offer" by the face and terms of the document. It was explained as such to Grievant and to other Union officials. Grievant knew or should have known from what supervision told him beginning on February 2, 1990 that he would be discharged for his misconduct unless he agreed to the reinstatement offer on a last chance basis.

*An offer to settle a discipline dispute on the basis of an agreement for extended suspension in lieu of discharge does not violate the Agreement.*

Grievant relies on the various Company letters saying Grievant "will" or "would be discharged" as showing that discharge was not timely imposed. Those letters were simply intended to emphasize to Grievant that the reinstatement offer would not be open indefinitely but in any event he had already been discharged within the terms of the Agreement after his suspension hearing. *Grievant was given his suspension hearing and grievance hearings as provided in Article X. There was no violation of due process or any timely requirements.*

*Id.* at 19–20 (emphasis added).

The Arbitrator, clearly, considered the relevant portions of the collective bargaining agreement in rendering his decision. The evidence indicates that, at most, the Arbitrator may have misconstrued the collective bargaining agreement or misapplied the facts before him. But such errors, if made, do not support the charge that his decision fails to draw its essence from the collective bargaining agreement. As the Supreme Court has warned, "a court should not reject an award on the ground that the arbitrator misread the contract."

*Misco, supra.* In order to succeed on his claim, plaintiff must show that the Arbitrator disregarded or modified plain and unambiguous contract provisions. *Storer Broadcasting, supra.* With regard to the Arbitrator's alleged treatment of Article X, § 2 of the agreement, this the plaintiff clearly has not done.

Plaintiff's second contention in support of his motion, that the arbitrator mischaracterized the nature of grievances AWN–17–90 and AWN–18–90, also fails to support the request to vacate the Arbitrator's Opinion. First, the Arbitrator specifically held that the reinstatement offer satisfied the requirements of Article X, § 2 of the collective bargaining agreement. *Id.* at 19; *see supra.* Contrary to plaintiff's assertions, the arbitrator thus clearly considered the validity of Amweld's offer held to the light of the collective bargaining agreement. The contention that the Arbitrator failed to consider the matter raised by grievance AWN–17–90 is therefore without merit. Whether the Arbitrator erred in this regard or misinterpreted the contract are not proper issues before the court. *Misco, supra.* Further, while he argues that Amweld's offer is not contemplated by the collective bargaining agreement and that the Arbitrator erroneously failed to realize this, plaintiff does not set forth any specific contractual provisions allegedly disregarded by the Arbitrator in this regard. This he must do as a threshold matter in a suit to vacate an arbitrator's award, *Storer Broadcasting, supra.* As to plaintiff's argument regarding grievance AWN–17–90, then, there is no validity to the contention that the Arbitrator's decision fails to draw its essence from the collective bargaining agreement.

The same is true regarding plaintiff's argument concerning grievance AWN–18–90. This grievance protested the termination of plaintiff by Amweld. The arbitrator specifically held that the discharge was based upon just cause and was not discriminatory. Arbitrator's Opinion at 21–23. Plaintiff has proffered no evidence that the Arbitrator disregarded any specific provisions of the collective bargaining

agreement when he drew these conclusions. Moreover, the Arbitrator's findings of fact and his credibility determinations evince some factual support for these determinations. Under such circumstances, an overturning of his decision is not warranted. *Misco, Interstate Brands, Storer Broadcasting, supra.*

For the foregoing reasons, the court declines to disturb the Arbitrator's Opinion and Award in this case. Plaintiff's motion for summary judgment, therefore, must be denied.

### B. The Union's Motion for Summary Judgment

In reviewing a motion for summary judgment, a court must consider the pleadings, related documents, evidence, and all reasonable inferences in a manner most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Smith v. Hudson*, 600 F.2d 60 (6th Cir.1979). Rule 56 provides, in relevant part, as follows:

(c) ...

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

(e) ...

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Three Supreme Court cases have provided guidance as to the nature of the respective burdens allocated under Rule 56. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986);

*Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The ultimate burden lies with the non-moving party to show the existence of a genuine issue of material fact. "When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts ... In the language of the Rule, the non-moving party must come forward with 'specific facts showing that there is a *genuine issue for trial.*' Fed.Rule Civ.Proc. 56(e)." *Matsushita*, 475 U.S. at 586–587, 106 S.Ct. at 1355–56 (emphasis supplied). "In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552. The court in *Anderson* held that "the plaintiff must present affirmative evidence in order to defeat a properly supported motion for summary judgment. This is true even where the evidence is likely to be within the possession of the defendant, as long as the plaintiff had had a full opportunity to conduct discovery." *Anderson*, 477 U.S. at 257, 106 S.Ct. at 2514.

On the other hand, the moving party's burden under Rule 56 is lighter.

Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. But unlike the Court of Appeals, we find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim. On the contrary, Rule

56(c) ... suggests the absence of such a requirement.

*Celotex, supra,* 477 U.S. at 323, 106 S.Ct. at 2552 (emphasis supplied).

■■■ The Sixth Circuit Court of Appeals, in *Street v. J.C. Bradford and Co.,* 886 F.2d 1472 (6th Cir.1989) recently reviewed court decisions and commentary regarding the impact of *Anderson, Celotex,* and *Matsushita* on summary judgment practice. The court concluded that a "new era" in summary judgment practice has opened in the court system as a result of these opinions.

Scholars and courts are in agreement that a "new era" in summary judgments dawned by virtue of the Court's opinions in these cases ... On the whole, these decisions reflect a salutary return to the original purpose of summary judgments. Over the years, decisions requiring denial of summary judgment if there was even a suggestion of an issue of fact and tended to emasculate summary judgment as an effective procedural device.

*Street, supra,* at 1476.

The court enunciated the following "new era" principles, among others: as on federal directed verdict motions, the "scintilla" rule applies, *i.e.,* the respondent must adduce more than a scintilla of evidence to overcome the motion; the respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment"; the trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact. *Id.* at 1479–1480 (footnotes and citations omitted).

In its motion for summary judgment, the Union contends that the conduct which is claimed to form the basis of the alleged breach of the duty of fair representation on its part is either factually misrepresented by plaintiff or insufficient as a matter of law under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). The court's analysis which follows will focus in large part upon these two aspects of the Union's argument. First, however, it is well to characterize the nature of this lawsuit and the statute under which it is brought, § 301 of the LMRA.

Section 301 provides as follows:

Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). Under this statute, an aggrieved employee may bring what has come to be known as a "hybrid 301" suit against his employer and the union. The action against the employer rests on § 301 itself and is based upon the claimed breach of the collective bargaining agreement, while the action against the union is implicitly premised upon the National Labor Relations Act. Clearly, the case at bar is properly labeled a hybrid 301 suit.

■■■ The Supreme Court has discussed the nature of this type of action as follows:

Such a suit, as a formal matter, comprises two causes of action. The suit against the employer rests on § 301, since the employee is alleging a breach of the collective bargaining agreement. The suit against the union is one for breach of the union's duty of fair representation, which is implied under the scheme of the National Labor Relations Act. "Yet the two claims are inextricably interdependent. 'To prevail against either the company or the Union, ... [employee-plaintiffs] must not only show that their discharge was contrary to the contract but must also carry the burden of demonstrating breach of duty by the Union.' "

*Mitchell, supra,* [451 U.S. 56] at 66–67, 67 L.Ed.2d 732, 101 S.Ct. 1559 [1565–66] (Stewart, J., concurring in judgment), quoting *Hines, supra,* [424 U.S. 554] at 570–571, 47 L.Ed.2d 231, 96 S.Ct. 1048 [1059–1060]. The employee may, if he chooses, sue one defendant and not the other; but the case he must prove is the

same whether he sues one, the other, or both. The suit is thus not a straightforward breach-of-contract suit under § 301, as was *Hoosier,* but a hybrid § 301/fair representation claim, amounting to "a direct challenge to 'the private settlement of disputes under [the collective-bargaining agreement]'" *Mitchell, supra,* [451 U.S.] at 66, 67 L.Ed.2d 732, 101 S.Ct. 1559 [1565] (Stewart, J., concurring in judgment), quoting *Hoosier,* 383 U.S. at 702, 16 L.Ed.2d 192, 86 S.Ct. 1107 [1111].

*Delcostello v. International Brotherhood of Teamsters,* 462 U.S. 151, 164–65, 103 S.Ct. 2281, 2290–91, 76 L.Ed.2d 476 (1983), citing *United Parcel Service, Inc. v. Mitchell,* 451 U.S. 56, 101 S.Ct. 1559, 67 L.Ed.2d 732 (1981); *Hines v. Anchor Motor Freight, Inc.,* 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Auto Workers v. Hoosier Cardinal Corp.,* 383 U.S. 696, 86 S.Ct. 1107, 16 L.Ed.2d 192 (1966). In recent time our own circuit has reiterated the

> established rule that the two constituent claims in every hybrid action—breach of collective bargaining agreement and breach of a union's duty of fair representations—are interdependent; if the first claim anchored in the employer's alleged breach of the collective bargaining agreement fails, then the breach of duty of fair representation claim against the union must necessarily fail with it. As this court held in *Bagsby v. Lewis Bros. Inc. of Tennessee,* 820 F.2d 799 (6th Cir.1987):

>> In this hybrid suit under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, to recover against *either* the company or the Union, [plaintiff] must show that the Company breached the Agreement *and* that the Union

breached its duty of fair representation. *Hines v. Anchor Motor Freight,* 424 U.S. 554, 570–71, 96 S.Ct. 1048, 1059, 47 L.Ed.2d 231 (1976). Unless [plaintiff] demonstrates *both* violations, he cannot succeed against either party.

*Id.* at 801 (emphasis in original); *accord Adkins v. Intern. Union of Elec. Radio & Machin.,* 769 F.2d 330, 336 (6th Cir. 1985).

*White v. Anchor Motor Freight, Inc.,* 899 F.2d 555, 559–60 (6th Cir.1990). It follows from this reasoning that if plaintiff's claim for breach of the duty of fair representation against the Union does not survive summary judgment scrutiny, then his claim against Amweld for breach of the collective bargaining agreement must also fail as a matter of law. See also *Black v. Ryder/P.I.E. Nationwide, Inc.,* 930 F.2d 505, 510 (6th Cir.1991) ("when the union cannot be held liable for unfair representation, of course, the employer cannot be held liable for breach of the collective bargaining agreement").[8]

■ The Union's motion for summary judgment and plaintiff's response thereto suggests some misunderstanding on the part of each party concerning the precise standards to apply in a § 301 fair representation suit in this cause. An inquiry into plaintiff's claim against the Union involves much more than an analysis of the alleged breach of Union duty under the circumstances before the court. It is necessary, additionally, that an examination be made of the relationship, if any, between the alleged duty and the Arbitrator's decision. That this is so is made evident by a review of several relevant higher court decisions

---

8. As did the court in *White,* we recognize that "[f]ederal courts have jurisdiction to hear fair representation suits whether or not they are accompanied by claims against the employers." *Id.,* 899 F.2d at 560, quoting *Breininger v. Sheet Metal Workers International,* 493 U.S. 67, 83, 110 S.Ct. 424, 434, 107 L.Ed.2d 388 (1989). Such independent fair representation suits have 28 U.S.C. § 1337 as a jurisdictional basis, rather than § 301. *See Storey v. Local 327, International Brotherhood of Teamsters,* 759 F.2d 517, 523 (6th Cir.1985). However, where the employee alleges breach of the collective bargaining agreement along with the duty of fair repre-

sentation, "the interrelationship between a union member, his union, and his employer is implicated." *White,* 899 F.2d at 561. As such, the employee in such a case cannot "circumvent the *Bagsby* rule simply by artfully pleading 28 U.S.C. § 1337 as a jurisdictional basis and casting their duty of fair representation claims as independent causes of action in what are, in substance, hybrid 301 claims." *Id.,* 899 F.2d at 562 (footnote omitted). In the case at bar, plaintiff's pleading of 28 U.S.C. § 1337 as a jurisdictional basis (complaint at ¶ 1) thus does not exonerate him from the *Bagsby* requirement.

which will be discussed at length below. A reading of these cases sets forth the following principle of labor law: where the collective bargaining agreement provides for binding arbitration, where the Union has processed an employee's grievances through arbitration, and where a final arbitration decision has been rendered, the plaintiff employee cannot succeed on his fair representation claim against the union unless he shows breach of the union duty of fair representation *and* a causal connection between the breach and an erroneous arbitration decision.

The seminal case which represents this principle is *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, *supra*. In that case, the plaintiff employees brought a hybrid 301 suit against their employer and union alleging wrongful discharge and breach of the duty of fair representation. The district court granted summary judgment in favor of both defendants, holding that there was no evidence of breach of union duty and that the decision of the arbitrator was binding on plaintiffs and their employer, thus barring relitigation of the wrongful discharge issue. On appeal, the Sixth Circuit Court of Appeals reversed the district court's finding that no factual issues existed as to plaintiffs' claim for breach of union duty. *Hines v. Local Union No. 377, Chauffeurs, Teamsters, Warehousemen & Helpers*, 506 F.2d 1153, 1156–57 (6th Cir.1974). The court, however, affirmed the district court's conclusion that, in the absence of evidence of misconduct on the part of the employer, plaintiffs were barred from relitigating the claim against the employer due to the finality of the arbitrator's decision under the collective bargaining agreement. *Id.*, 506 F.2d at 1157–58.

The Supreme Court reversed the Sixth Circuit's affirmance of the district court's judgment in favor of the employer. The Court reasoned that, where the union has breached its duty of fair representation in processing a grievance through arbitration, and where this breach has contributed to an erroneous arbitration decision, the employer cannot utilize the decision as a bar to the employee's § 301 breach of contract

claim against it. *Hines*, 424 U.S. at 570–71, 96 S.Ct. at 1059–60. In other words, an arbitration decision in favor of the employer is "reviewable and vulnerable if tainted by breach of duty on the part of the union," regardless of whether the employer is guilty of conspiracy with the union or of other misconduct during the grievance or arbitration proceedings. *Id.*

In so reasoning, the Court set forth an aspect of the nature of fair representation suits highly significant for our purposes. The Sixth Circuit has utilized the language of *Hines* which discusses the effect of an otherwise final arbitration decision tainted by breach of union duty, and from this language has prescribed a particular standard to apply in such situations. Where the employee seeks recovery from the union for breach of the duty of fair representation after a final arbitration decision in favor of the employer has been rendered, he is in reality seeking to vacate the arbitration decision; in such a case, the following reasoning is applicable:

> A court may not review the merits of an arbitration decision, even when the basis for the decision is ambiguous, as long as the award draws its essence from the bargaining agreement. *See United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 598–99, 80 S.Ct. 1358, 1361–62, 4 L.Ed.2d 1424 (1960). Even in the event of a union's breach of its duty of fair representation, an arbitration award is not quickly set aside. Kroger correctly asserts that to vacate an arbitration award on this ground, there must be two findings. *First, the Union must have breached its duty of fair representation to the employee. Second, the breach of duty by the Union must have tainted the arbitrator's decision. The breach must have contributed to the arbitrator's making an erroneous decision. Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976).

*Wood v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, Local 406*, 807 F.2d 493, 500 (6th Cir.1986) (emphasis add-

ed), *cert. denied* 483 U.S. 1006, 107 S.Ct. 3232, 97 L.Ed.2d 738 (1986). *See also United Parcel Service v. Mitchell*, 451 U.S. 56, 61–62, 101 S.Ct. 1559, 1562–1563, 67 L.Ed.2d 732 (1981); *Apperson v. Fleet Carrier Corporation*, 879 F.2d 1344, 1355 (6th Cir.1989), *cert. denied* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 533 (1990); *Taylor v. Ford Motor Company*, 866 F.2d 895, 896 (6th Cir.1989) ("When a dispute proceeds to arbitration with a decision in favor of the employer, the employee must not only prove unfair representation, he must also prove that 'there is substantial reason to believe that a union breach of duty contributed to the erroneous outcome of the contractual proceedings,'" quoting *Hines*).

In *White v. Anchor Motor Freight, Inc.*, 899 F.2d 555, *supra*, the Sixth Circuit further clarified this standard:

Thus, the validity of any hybrid 301 claim is anchored as equally in a finding that the union has breached its duty of fair representation as it is in a finding that the collective bargaining agreement has been breached and that an arbitrator or its equivalent erroneously failed to rule in favor of the grievant employee. Supreme Court and Sixth Circuit precedent teaches that a federal court's jurisdiction to review an arbitrator's decision is predicated on an allegation that the arbitrator reached an erroneous decision. As the Supreme Court has noted, in a hybrid 301 action, "the focus is ... on whether, contrary to the arbitrator's decision, the employer breached the contract and whether there is substantial reason to believe that a union breach of duty contributed to the *erroneous* outcome of the arbitral proceedings." *Hines v. Anchor Motor Freight*, 424 U.S. 554, 568, 96 S.Ct. 1048, 1058, 47 L.Ed.2d 231 (1976) (emphasis added). "A court may not review the merits of an arbitration decision, even when the basis for the decision is ambiguous, as long as the award draws its essence from the bargaining agreement." *Wood v. Intern. Broth. of Teamsters*, 807 F.2d 493, 500 (6th Cir. 1986). In the context of a hybrid 301 action, absent a finding that an errone-

ous arbitral decision has been reached, the inquiry into the union's failure to comply with its duty of fair representation becomes immaterial, and is not justiciable.

*Id.*, 899 F.2d at 560. Thus, in order to succeed against the union in this type of hybrid 301 suit, the employee must successfully prove three elements:

1) the union breached its duty of fair representation;

2) there is substantial reason to believe that the breach of union duty contributed to

3) an erroneous arbitration decision.

The court in *White*, further, held that the final two elements comprise the "ultimate issue": "Thus, the ultimate issue with respect to the claim against the union in any hybrid 301 case is whether the alleged breach of the duty of fair representation 'contributed to the arbitrator's making an *erroneous* decision.'" *Id.*, quoting *Wood* (emphasis in original).

Under *White*, the first issue which must be addressed and which determines the justiciability of the hybrid 301 suit in the first instance is whether the arbitration decision is "erroneous." As to this element, it is necessary to define the proper standard of review in such a situation. The language of *White* and *Wood* indicates that the appropriate standard of review to apply to an arbitration decision in hybrid 301 suits of this type against a union is that discussed above, *viz.*, whether the decision draws its essence from the collective bargaining agreement. If this is the case, then plaintiff's § 301 suit against the Union fails as a matter of law because the threshold requirement that there be an erroneous arbitration decision has not been met. *See* discussion *supra; Misco*, etc.

On the other hand, certain Sixth Circuit authority indicates that a hybrid 301 suit seeking to vacate an arbitrator's decision is but one of several *alternative* means by which to seek vacation of the arbitration decision. For instance, in *Apperson*, the court discussed the strict *Misco* standard of review which is usually applicable to mo-

tions to vacate arbitration awards. *Apperson,* 879 F.2d at 1353. The court then indicated that there were two *other* means by which to seek such relief: first, in a fair representation suit against the union such as the instant case; and second, a suit to overturn the award because of alleged bias on the part of the arbitrator. *Id.*[9] The court held that in such situations, unlike that where the employee's suit amounts to nothing more than an attempt to appeal the award on the merits, "[t]he federal courts need not defer to such arbitration awards." *Id.* As such, it appears that in such instances, the strict deferral rule enunciated in *Misco* would not apply.

The court believes that, in light of the fact that this case is under review on summary disposition, the safest course is to follow the reasoning of *Apperson* and to decline to follow the strict *Misco* deferral rule. Applying a broader standard of review, we believe issues of fact exist concerning whether the Arbitrator's decision was erroneous in this case, *i.e.,* whether he misinterpreted the collective bargaining agreement or misconstrued the facts.[10] As such, the court finds that plaintiff's fair representation suit against the Union is justiciable, and so we proceed to an analysis of the remaining two elements of such a suit.

With regard to the first element, whether a breach of the duty of fair representation occurred, the Supreme Court long ago defined the parameters of this type of breach by stating that "the exclusive agent's statutory authority to represent all members of a designated unit includes a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Vaca v. Sipes,* 386 U.S. 171, 177, 87 S.Ct. 903, 909, 17 L.Ed.2d 842 (1967). In other words, "[a] breach of the statutory duty of fair representation occurs only when a union's conduct toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." *Id.,* 386 U.S. at 190, 87 S.Ct. at 916.

■ The Sixth Circuit has held that each of these three requirements—that the union's representation of its members not be arbitrary, discriminatory, or in bad faith— "represents a distinct and separate obligation, the breach of which may constitute the basis for civil actions." *Ruzicka v. General Motors Corp.,* 523 F.2d 306, 310 (6th Cir.1975), quoting *Griffin v. International Union, UAW,* 469 F.2d 181, 183 (4th Cir.1974). Nonetheless, the Circuit has also narrowly limited the viability of fair representation claims to situations where the union is guilty of differential treatment by means of one of the three stated types of misconduct.

> We conclude, as a matter of law, that the duty of fair representation is implicated only when an individual or group is treated differently by a union—either through discriminatory, bad faith, or arbitrary conduct—than another individual, group or the collective.

*National Labor Relations Board v. Local 299, International brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America,* 782 F.2d 46, 51–52 (6th Cir.1986). This view has been labeled "restricted" and "limited" by at least one court, *see Alicea v. Suffield Poultry, Inc.,* 902 F.2d 125, 130 (1st Cir.1990).

---

**9.** The court noted that it did "not intend this to be an exhaustive list of the situations permitting a court to vacate an arbitration award." *Id.* n. 10.

**10.** Our approach here should not be construed as inconsistent with that applied to plaintiff's motion to vacate the Arbitrator's Opinion and Award. There, plaintiff sought a review of the award and acquiesced in the application of the strict deferral standard; plaintiff did not allege the Union's alleged breach of duty contributed to an erroneous decision. Plaintiff, in other words, did not urge the court to utilize the approach to hybrid 301 suits against unions enunciated in *Apperson,* but rather only alleged that the decision failed to draw its essence from the collective bargaining agreement. With regard to the Arbitrator's decision, clearly, plaintiff has thus sought two separate forms of relief: a requested overruling of the decision on the narrow grounds set forth in *Misco,* and a request to vacate the decision based upon the Union's alleged breach of the duty of fair representation.

The Circuit's view in *N.L.R.B. v. Local 299* amounts to the holding that, where the employee alleges that the union treated him discriminatorily, arbitrarily, or in bad faith, this allegation serves as a claim that the union has singled him out for different treatment. *Id.* The disparate treatment issue is therefore secondary to the initial inquiry into whether the union has engaged in discriminatory, bad faith, or arbitrary conduct towards the employee. We thus now proceed to determine whether the record evinces facts which support the claim that the Union is guilty of one or more of these three types of misconduct. The holding in *Local 299* will be discussed again in a later portion of this opinion.

■ In support of its motion, as mentioned previously, the Union submits that the conduct alleged to form the basis of plaintiff's suit on its part is either factually belied by the record or insufficient as a matter of law to form the basis of a fair representation claims. The court agrees with the Union that, upon a thorough examination of the record, several of the claims of Union misconduct are simply not true. For instance, in the first allegation,[11] plaintiff charges that Amweld's issuance of the personal report on February 2 was untimely and that the Union breached its duty by not objecting to this untimeliness. According to plaintiff, the parties intended the following language of the collective bargaining agreement to mandate that such personal reports be issued and the suspension thereunder take place on the date of the alleged employee misconduct:

An employee shall not be peremptorily discharged. In all cases in which Management may conclude that an employee's conduct may justify suspension or discharge, he/she shall be suspended initially for not more than five calendar days, (excluding Saturdays, Sundays, and Holidays). Notice of suspension shall be given promptly to the Grievance Committeeman and the employee concerned. The suspension shall take effect not later than the end of the shift on which the

employee is working. In all cases in which Management may conclude that an employee's conduct may justify suspension or discharge, he/she with his Union representative, shall be granted a hearing and statement of the offense before the department head concerned or his/her representative before he/she is sent home. The hearing may be postponed in cases where the employee's continued presence in the plant represents a threat to himself and/or other employees.

*Id.,* Article X, § 2; Plaintiff's Deposition I at 50. However, when asked whether the Union made an objection at either the February 9 or 13 hearing to Amweld's purported failure in this regard, plaintiff testified that he could not recall if such were in fact made:

Q. Were you aware prior to going into the hearing of the 9th that the Company had violated its obligation to provide you with a prompt personal report?

A. Yes.

Q. And you simply don't recall today whether or not you complained during the meeting of the 9th or whether anybody else on your behalf complained during the meeting on the 9th of the Company's alleged failure to provide you with a prompt personal report?

A. I thought I answered that.

Q. I'm just restating and reconfirming that you don't recall whether or not anybody said anything about that in the meeting of the 9th.

A. I don't recall at this time.

Q. Okay. Now, did you, between the time of the meeting of the 9th and the meeting of the 13th, review the collective bargaining agreement?

A. No.

Q. And, therefore, you did not review the provisions of the grievance procedure of the collective bargaining agreement prior to going into the meeting of he 13th; is that right?

A. That's right.

Q. Now, during the meeting of the 13th, did you or anyone on your behalf

---

11. When discussing plaintiff's allegations in this manner, the court hereinafter refers to the numbered allegations as we have summarized them on pages 1296–1297 *supra.*

complain that the personal report was not timely under the agreement in that it was not given promptly?

A. I can't recall at this time if it was said.

Q. Okay. Now, let's go back to the meeting of the 9th and let me ask whether or not you complained or somebody complained on your behalf in the meeting of the 9th that the suspension did not take effect not later than the shift on which you were working?

A. I don't recall at this time if it was said.

Q. And what about the meeting of the 13th do you recall?

A. I just answered that.

Q. I asked you about any other meetings of the 9th. I'm sorry if that wasn't clear.

A. You asked me about the meeting of the 13th, also.

Q. So, it's your testimony here today that you don't recall whether or not anybody protested in either the meeting of the 9th or the meeting of the 13th that your suspension did not take effect not later than the shift on which you were working?

A. I don't recall at this time when the complaint was made. It might have been at the third step meeting. I can't recall at this time.

Q. Okay.

A. Or the earlier, too.

Plaintiff's Deposition I at 79–81. This testimony, clearly, is inconsistent with the allegation that the Union did not in fact assert the objection. For this reason, the court finds it unmeritorious as a matter of law.

The second allegation, that the Union failed to protest Amweld's failure to give plaintiff a fair hearing prior to his February 2 suspension, also is belied by plaintiff's own testimony:

Q. Now, in paragraph 19 you said that the Union made no protest of Amweld's violation of your contractual right to this

hearing. Do you see that in paragraph 19?

A. Yes.

Q. When should the Union have made this protest, at what stage of the processing of your grievance?

A. Step three.

Q. You were present at step three and you spoke at step three; is that right?

A. Yes.

Q. Did you explain what happened in this meeting at step three?

A. Yes.

Q. And you explained, as you have done here today, what Mr. Brest said to you and your Union representatives?

A. Yes.

Q. And did you say that that was wrong and that that was a violation of the contract at the step-three meeting?

A. To the best of my knowledge, that was said.

Q. Okay. It was said by you?

A. I don't recall who said it at this time.

Q. *Okay. But somebody on behalf of the Union said it?*

A. *Yes.*

Q. Okay. Then I guess I don't understand your allegation in paragraph 19 where you said that the Union made no protest of this violation of your contractual right to the hearing.

A. Speaking of the International.

Q. Okay. So, somebody at the hearing said it, but it wasn't Willie Hall?

A. Not to my recollection it was not Willie Hall.

Q. Okay. So, what you are saying is that even though it was said by somebody else, Willie Hall should have said it, too?

A. Yes.

Plaintiff's Deposition I at 64–66 (emphasis added). Clearly, contrary to plaintiff's contention, the Union did assert the protestation referred to.[12]

---

**12.** We do not find merit in plaintiff's belief that the International Union had the duty to cumulatively assert the objection when such had already been made on behalf of the Union by a local representative.

With regard to the third allegation, the complaint itself charges that the reinstatement offer was given on the second day of the suspension hearings, February 13. *Id.* at ¶ 26; *see also* Plaintiff's Deposition I at 86. Moreover, plaintiff received the offer by mail on February 16. *Id.* at 98. Thus, the offer was mailed, at most, two days after the conclusion of the hearing. Plaintiff's suggestion that Amweld's disposition was not prompt is, therefore, untenable, and thus the charge that the Union breached its duty by failing to object to the "untimeliness" does not contain merit.

The seventh, eighth and ninth allegations are controverted by the filing of grievance AWN–17–90. In that grievance, the Union objected to the condition imposed by Amweld that unless plaintiff sign the reinstatement agreement, he could not return to work. This grievance, in addition, serves as an objection to Amweld's conduct on March 1 in general. Clearly, by means of the filing of grievance AWN–17–90, the Union did urge the protestations referred to in these allegations.

The seventeenth allegation charges that Hall failed to meet with plaintiff's witnesses until immediately prior to the arbitration hearing. This contention is belied by the testimony of Hall, who states that he had met with the witnesses and discussed plaintiff's case with them during the earlier suspension hearings and Step Three meetings. Further, if plaintiff is contending that Hall failed to adequately prepare the witnesses, this is also controverted by Hall's statements:

11. Prior to Mr. Bruno's arbitration hearing I met and discussed his grievances at great length with Mr. Bruno, Robert Ulrich, Christopher Giron, Richard Williamson, David Darbey and Carmen Johns. I explored the grievances with these individuals in conjunction with Mr. Bruno's suspension hearing and his Step three (3) grievance meetings, in addition to meeting with them the day before the arbitration hearing for several hours.

12. I asked Mr. Bruno if there were other witnesses who could testify to the facts concerning his grievances at the arbitration hearing and he told me that he would notify any other witnesses that he wanted to be present. Several additional witnesses did attend the hearing to testify for Mr. Bruno. I met with these witnesses before the hearing and when I began to prepare them, Mr. Bruno told me that they all knew what to say. I then advised these witnesses concerning the manner in which an arbitration hearing is conducted, I told them to be truthful and to only answer the question that is asked.

Hall Affidavit at ¶ 11–12, Exhibit D to Motion for Summary Judgment. Plaintiff has failed to set forth record evidence which tends to counter this testimony as is his burden under Rule 56.

Plaintiff's own testimony discredits the claim made in the eighteenth allegation.

Q. Were all of the people that you wanted to be witnesses on behalf of your case then available either on the next day of the arbitration hearing or on the final day of the arbitration hearing?

A. Would you repeat that, please?

Q. Yes. Let me rephrase it a little differently. Was there any witness who because of this misunderstanding who was not available for the arbitration hearing?

A. They were there at the arbitration hearing.

Q. All right. So, all of your witnesses ultimately were available at the arbitration hearing?

A. They were there at the arbitration hearing.

Plaintiff's Deposition II at 16. If all of plaintiff's witnesses attended the arbitration hearing, then the contention that they were not notified of the time and date of the hearing can not, as a matter of pure logic, be true.

The Arbitrator's decision discredits the nineteenth, twentieth, and twenty-first allegations. The Arbitrator addressed plaintiff's allegations of untimeliness and due process violations regarding the suspension and discharge in his written decision. In order for the Arbitrator to have addressed

these contentions, they must have been raised by the Union at the arbitration hearing. Clearly, then, the Union made the objections referred to in allegations nineteen and twenty.

As for allegation twenty-one, the Arbitrator found that there was just cause for plaintiff's discharge, *viz.*, the January 26 and 29 misconduct and his previous disciplinary record. The Arbitrator also found that the refusal to reinstate plaintiff unless he signed the reinstatement agreement did not violate the collective bargaining agreement. Thus, the Arbitrator addressed *both* of Amweld's stated reasons for discharge (*i.e.*, plaintiff's misconduct and his refusal to sign the reinstatement agreement). It necessarily follows that the Union must have argued that both reasons were improper. Thus, the contention in allegation twenty-one contains no support in the record.

Finally, nothing in the record demonstrates that the Arbitrator attempted to "intimidate" plaintiff into signing the reinstatement agreement, as is claimed in allegation twenty-two. Plaintiff's own testimony reveals that, at the conclusion of the hearing, the Arbitrator merely recommended that plaintiff accept the offer.

> He said, "If I were you," he said, "I would take the Company's reinstatement offer." He said, "If you want me to," he said, "I'll write one up for you right now." He also said, "If the names that you called them"—and I tried to explain to Mr. Duda that I didn't call them any names. He said, "I didn't say you did." Getting back to the point where he said he would take the reinstatement offer that the Company offered, he said, "I'll give you five minutes to make up your mind." He said, "You sit here with your staff representative and you talk it over." That was pretty much I think at this time what I can recall.

Plaintiff's Deposition II at 110. Plaintiff's own characterization of this discourse certainly does not suggest intimidation of any sort on the part of the Arbitrator.

With regard to the remaining allegations, the court must ascertain whether, under the undisputed factual circumstances surrounding each, the Union conduct referred to can be said to amount to breach of the duty of fair representation. In other words, the question facing us is whether the asserted conduct was undertaken discriminatorily, arbitrarily, or in bad faith. We agree with the Union that this question must be answered in the negative.

■ With regard to the charge of Union discrimination, plaintiff has set forth no evidence from the record which tends to indicate that the Union's processing of plaintiff's grievances or its representation of him at arbitration was motivated by class-based discriminatory animus. The court, moreover, is unable to locate any such evidence, either direct or circumstantial, nor are we able to find anything indicating that plaintiff's class, whatever it may be, has been adversely impacted from disparate Union representation. Indeed, there is no allegation in this case that plaintiff even belongs to a protected class, other than as a member of the Union. However, even here plaintiff has not alleged that the Union has discriminated against him for Union membership, an allegation which we believe would be logically inconsonant in any event. For these reasons, plaintiff's broadly stated allegation that the Union has discriminated against him fails as a matter of law.

■ The court likewise does not believe that Hall's representation of plaintiff can be said to amount to "bad faith" representation. In order to succeed on such a claim, we believe plaintiff would have to demonstrate that Hall's actions were motivated by ill will toward plaintiff or some other type of dishonest purpose. However, when asked whether he had any idea concerning why Hall represented him in the manner alleged, plaintiff stated that he did not know "if Mr. Hall likes me or not," and that he did not otherwise know why Hall acted as charged. Plaintiff's Deposition II at 24, 27. Plaintiff's bad faith claim, in reality, is merely a blanket assertion that each instance of Union misconduct alleged represents bad faith behavior.

Q. What conduct made Mr. Hall's handling of your case a matter of bad faith?

A. Well, I think it says, "as set forth above."

Q. So, you say if you look at what he did, you'll see that it was in bad faith; is that what you're saying?

A. Yes.

*Id.* at 77 (discussing ¶ 69 of the complaint, which alleges that the Union's conduct "as set forth above was ... in bad faith ..."). With no evidence that Hall's claimed actions were motivated by ill will or dishonest purpose, such a blanket averment does not withstand scrutiny.

It remains to determine whether the record evinces any support that the alleged Union misconduct can be said to be "arbitrary." In fair representation suits, this term has been defined as the handling of a grievance "in a 'perfunctory' manner, with caprice or without rational explanation." *Poole v. The Budd Company,* 706 F.2d 181, 183 (6th Cir.1983). That is, "[a]n arbitrary decision is one which arises from caprice or is without reason." *Ruzicka v. General Motors Corporation,* 649 F.2d 1207, 1211 n. 3 (6th Cir.1981) ("*Ruzicka II*"). More recently, the Supreme Court has stated as follows:

> The doctrine of fair representation is an important check on the arbitrary exercise of union power, but it is a purposefully limited check, for a "wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents." *Ford Motor Co. v. Huffman,* 345 U.S. 330, 338, 97 L.Ed. 1048, 73 S.Ct. 681 [686] (1953). If an employee claims that a union owes him a more far-reaching duty, he must be able to point to language in the collective-bargaining agreement specifically indicating an intent to create obligations enforceable against the union by the individual employees. Cf. *Republic Steel Corp. v. Maddox,* 379 U.S. 650, 653, 13 L.Ed.2d 580, 85 S.Ct. 614 [616] (1965).

*United Steelworkers of America, AFL–CIO–CLC v. Rawson,* 495 U.S. 362, 374, 110 S.Ct.1904, 1912, 109 L.Ed.2d 362, 376–

77 (1990). Finally, this principle has since been reinforced in the strongest of terms:

> As we acknowledged above, Congress did not intend judicial review of a union's performance to permit the court to substitute its own view of the proper bargain for that reached by the union. Rather, Congress envisioned the relationship between the courts and labor unions as similar to that between the courts and the legislature. Any substantive examination of a union's performance, therefore, must be highly deferential, recognizing the wide latitude that negotiators need for the effective performance of their bargaining responsibilities. Cf. *Day–Brite Lighting, Inc. v. Missouri,* 342 U.S. 421, 423, 96 L.Ed. 469, 72 S.Ct. 405 [406] (1952) (court does "not sit as a superlegislature to weigh the wisdom of legislation nor to decide whether the policy which it expresses offends the public welfare"); *United States v. Carolene Products,* 304 U.S., [144] at 154, 82 L.Ed. 1234, 58 S.Ct. 778 [784] (where "question is at least debatable," "decision was for Congress"). For that reason, the final product of the bargaining process may constitute evidence of a breach of duty only if it can be fairly characterized as so far outside a "wide range of reasonableness," *Ford Motor Co. v. Huffman,* 345 U.S., at [330] 338, 97 L.Ed. 1048, 73 S.Ct. 681 [686] that it is wholly "irrational" or "arbitrary."

*Air Line Pilots Association, International v. O'Neill,* — U.S. —, — – —, 111 S.Ct. 1127, 1135, 113 L.Ed.2d 51, 64–65 (1991). *See also Perry v. Million Air,* 943 F.2d 616, 619 (6th Cir.1991).

 With regard to the remaining allegations, for which the record provides some factual support, the court must now determine whether, under the undisputed circumstances surrounding each allegation, the charged Union conduct arguably falls within the above-cited definition of "arbitrary." The fourth and fifth allegations charge that the Union did not object to Amweld's failure to return plaintiff to work on February 12 or to the reinstatement agreement presented to plaintiff on

February 13. However, plaintiff testifies that he himself asserted both objections on February 13:

Q. In paragraph 27 of your complaint, you say that defendant Union did not object to the reinstatement agreement presented to plaintiff on February 13, 1990, or the fact that he had not been returned to work. Do you recall that?

A. Which paragraph was it?

Q. Twenty-seven.

A. Yes.

Q. Did you object to that reinstatement agreement?

A. Yes.

Q. And you complained orally to the Company about it, didn't you?

A. I complained to the Company orally and I had it on—I think we are talking about the same one. Okay, that's correct, on the 13th, yes.

Q. So why did Mr. Hall have to object to this if you had already objected to the Company about it in the same meeting?

A. Mr. Hall should have objected to it both at the meeting and the arbitration proceedings.

Q. Now, isn't it true that both at the meeting and at the arbitration proceeding you testified to this reinstatement agreement and you stated your objection to it?

A. I objected to the reinstatement agreement, yes.

Q. And isn't it true that both in the meeting and at the arbitration hearing you stated your objection to it?

A. To the best of my recollection, I did.

Q. Okay. Now, paragraph 30 you claim that the reinstatement agreements dated February 13 and February 14 are contrary to the provisions of the collective bargaining agreement and you claim that the Union didn't protest those reinstatement agreements and did not insist that you be returned to work. My question to you is whether or not you protested those agreements and you insisted that you be returned to work. Did you protest them and did you insist that you be returned to work?

A. I protested the reinstatement offers, I questioned the reason why I wasn't back to work.

Q. And did you insist that you be returned to work?

A. I believe I did at this time, yes.

Plaintiff's Deposition II at 58–60. The court does not believe that, where an employee vigorously protests company action, a subsequent union failure to cumulatively do so can be said to amount to "arbitrary" conduct within the meaning of *O'Neill.* Inasmuch as a union failure to object under these circumstances clearly has a rational basis, *viz.,* the fact that the employee has himself already voiced disapproval, such a claim does not withstand scrutiny as a matter of law.

■ With regard to the sixth allegation, plaintiff's testimony is somewhat inconsistent. On one hand, he states that Amweld did not permit the Union to present witnesses on February 23. Plaintiff's Deposition I at 124. On the other hand, however, he testifies that the Union was not permitted to question either their own or Amweld's witnesses. This view indicates that Union witnesses were in fact presented on February 23. *Id.* at 131. Even if the former version of the February 23 meeting were accepted, however, we do not believe that the Union's purported failure to object can be said to amount to more than ordinary negligence. The undisputed evidence indicates that plaintiff and several Union representatives all "spoke freely in support of Mr. Bruno." Hall Affidavit at ¶ 4, Exhibit D to Union's Motion for Summary Judgment. Moreover, plaintiff admits that he communicated his version of the events. Plaintiff's Deposition I at 131. Under these circumstances, the alleged Union conduct clearly cannot be labeled "wholly 'irrational.'" *O'Neill,* —— U.S. at ——, 111 S.Ct. at 1136, 113 L.Ed.2d at 65.

■ The alleged failure of the Union to object to Amweld's purported untimeliness, allegations ten and eleven, *supra,* is based upon a rational explanation, as follows:

6. If any time limits were not met per the letter of the contract for Grievances 17–90 or 18–90, this was due to the fact

that I was engaged in ongoing discussions with the Company concerning these grievances, trying to get them resolved without more meetings or arbitration. During my tenure as the Staff Representative for Local 3418 the Company and I have waived contractual time limits as long as we were having discussions concerning a grievance, and these grievances were handled in the same manner.

Hall Affidavit at 6. In attempting to show that issues of fact persist on the question of whether the past practice of the Union amounts to waiver of time restraints under the collective bargaining agreement, plaintiff states in his motion for summary judgment that "these are matters in dispute," and cites in broad fashion to his deposition, with no page references.

A review of plaintiff's testimony, however, indicates that he does not in fact have any information as to whether the Union and Amweld have waived time restraints in the past:

Q. Do you know whether the Company and the Union agreed to waive that time limit in these two grievances?

A. Are you talking about the International Union?

Q. Yes, Sir.

A. *I don't know what they did.* I know the Local Union and I didn't agree to waive any time limits.

Q. But these grievances were filed directly in the third step, weren't they?

A. Yes.

Q. So, it was the International that had control of them, not the Local or yourself; isn't that right?

A. Yes. I don't think they would violate the contract.

Q. Well, it's not a matter of violating the contract, it's simply an agreement to an extension of time, isn't it?

A. I won't be argumentative on that.

Q. All right. Do you know whether or not Mr. Hall and Mr. Pelphrey agreed orally to extend the time limits for grievances 17 and 18?

A. *No, I don't know what they did.*

Q. Okay. To your knowledge, has the Company and the Local Union in the past agreed to extend the time limits contained in the grievance procedure with respect to any grievance?

A. Not under Article 10, to my knowledge, it was never waived.

Q. All right. To your knowledge, his the International representative ever waived the time limit under a grievance filed pursuant to Article 10?

A. *I can't recall at this time if the International Union has done that. I just can't recall.*

Plaintiff's Deposition I at 168–170 (emphasis added). Whether Amweld and the *Local Union,* which is not a party to this lawsuit, has agreed to waiver is irrelevant. What is important is that the *International Union,* the named defendant here, is indisputably a party to such waiver with Amweld. In addition, it remains uncontroverted that the contractual time restraints were not followed for the additional reason that the Union was attempting to settle the grievances with Amweld.

Reasons such as these, if uncontroverted, cannot form the basis of a fair representation claim against a union:

Such conduct does not amount to the arbitrariness which *Ruzicka I* held will constitute a breach of the duty of fair representation. Nor does it amount to the perfunctory calculation of a "non-grievance" as in *Williams v. Teamsters Local Union No. 984,* 625 F.2d 138 (6th Cir.1980). Concomitantly, it does not equal the inept handling of a grievance by a union ignorant of the contract provisions relevant to the case as in *Milstead v. International Brotherhood of Teamsters,* 580 F.2d 232 (6th Cir.1978). In relying on a past practice, a union's omission is based on a wholly relevant consideration, is not intended to harm its member, and is not the type of arbitrariness which reflects reckless disregard for the rights of the individual employee. Such conduct, at times, manifests no more than ordinary negligence and we cannot hold a union liable for breach of the duty of fair representation based upon simple negligence. The law in this circuit proscribes that result.

*Ruzicka II,* 649 F.2d at 1211–1212 (footnote omitted). *See also Perry,* 943 F.2d at 619. Thus, the tenth and eleventh allegations do not survive scrutiny as a matter of law.

▪ In the twelfth allegation, plaintiff complains that the Union breached its duty by combining the three grievances for arbitration. Plaintiff's testimony reveals that he did not object to Hall or the Union about this, but in fact acquiesced in the arbitration of all three grievances at once.

Q. At what point did the grievances get combined for purposes of arbitration?

A. To the best of my knowledge, it was when Willie Hall sent a letter appealing all three grievances to arbitration at once.

Q. Did you get or learn of that letter?

A. Yes, I know of that letter.

Q. Did you raise a protest with Mr. Hall at the time you received a copy of that letter?

A. I can't recall protesting with Mr. Hall about that, no.

Q. All right. At any subsequent point in time did you protest the combination of those three grievances and the arbitrating of all of them before a single arbitrator?

A. Being arbitrated at the same time to expedite the procedure was not a problem.

Q. Okay. Was there any problem in regard to having all three of them handled in the same proceeding?

A. As long as they were argued separately, I didn't see anything wrong with them going at the same time to expedite the arbitration procedure or getting them to arbitration, but they weren't one in the same grievances, no, if that's your question.

Q. No, that wasn't my question.

A. I'm sorry.

Q. My question was only whether or not you had an objection to them all being arbitrated in the same proceeding.

A. I don't remember objecting to that.

Q. Okay. Did you make clear at any point in time to Mr. Hall that these were separate and individual grievances which you believed needed to be argued separately?

A. No, I didn't think it was necessary. Clearly, even under plaintiff's own version of the facts, the combining of the grievances by the Union was not "arbitrary" conduct.

▪ Allegations thirteen, fourteen, and fifteen merit little attention. Plaintiff testified as to his dissatisfaction with Duda as arbitrator as follows:

Q. Why were you displeased with the selection of Arbitrator Duda?

A. Just several months earlier Mr. Duda sat in on arbitrations or was the Arbitrator for Martha Joffray and he gave an unfavorable conclusion to that arbitration.

Q. And that was the sole reason why you objected to his being your arbitrator?

A. No.

Q. What other reason was there?

A. I felt that he was biased in his decision. I felt that he allowed the Company to change their reason for discharge on Martha. I felt that he violated our language when he went back more than 18 months in Martha's records. And that's all I can think of right now.

Plaintiff's Deposition I at 180. Plaintiff's personal displeasure with Duda, by itself, is an insufficient ground upon which to base a fair representation claim. Without a concomitant claim that the Union engaged in some form of misconduct during the arbitrator selection process, the claim in the thirteenth allegation simply fails.

▪ Similarly, the fact that the Union denied plaintiff's request to be represented by his own counsel during arbitration and that the Union made no arrangement for the preservation of a transcript (allegations fourteen and fifteen) does not aid plaintiff. Such are common Union practices; the Union ordinarily provides representation during all arbitration hearings and does not order transcripts for such hearings. Hall Affidavit at ¶¶ 9–10. Such common practices are not, as a matter of law, "so far outside a 'wide range of reasonableness,' … as to be 'irrational.'" *O'Neill,* —— U.S.

at ——, 111 S.Ct. at 1136, 113 L.Ed.2d at 65.

■ In the sixteenth allegation, plaintiff finds fault with the Union's failure to object to the Arbitrator's characterization of the three grievances as "discharge" grievances. This allegation ignores the fact that the Arbitrator in his opinion discussed *each* of the issues raised in *all three grievances*, despite the characterization. *See* Arbitrator's Opinion and Award at 19–23. This court is of the opinion that where an arbitrator labels different grievances under one category but nonetheless addresses the claims made in each grievance, a union failure to contest the labeling is not "arbitrary" conduct within the meaning of *O'Neill.*

■ In the twenty-second allegation, plaintiff cites Union breach in the failure to object when the Arbitrator refused to permit plaintiff to speak, submit evidence, make objections, question witnesses, or otherwise participate in the proceedings. When plaintiff's testimony is examined, it is revealed that the Arbitrator refused to permit plaintiff to interrupt the proceedings by directly voicing objections and questioning witnesses *himself:*

Q. Now, the next objection that you say Mr. Hall should have made related to limits which were placed upon your conduct. I guess that's a general way of saying it. You told me that you weren't allowed to argue or examine. I don't know if there were other things. What happened here? What's this all about?

A. Be more specific.

Q. You said you weren't allowed to argue?

A. No.

Q. Explain what you wanted to do and how you were not permitted to do it and why he should have objected.

A. I wasn't allowed to speak to question any of the Company witnesses, to object to what they were saying, and he never told the arbitrator that he felt that I should be allowed to do so or participate in the arbitration proceedings.

Q. You wanted the right to question witnesses; is that what you mean when you say "question"?

A. I answered the question.

Q. I don't think so, because I didn't ask you that question. When you say you weren't allowed to question, do you mean that you were not permitted to question witnesses in the arbitration proceeding?

A. I was not permitted to question witnesses, that's correct.

Q. And when you say you were not permitted to object, do you mean that you were not permitted to raise objections to questions opposed by counsel for the Company during the arbitration proceeding?

A. I wasn't allowed to object to the answers that the Company witnesses were giving.

Q. Okay. Can you give me a couple of examples of the kind of objections that you wanted to make? Give me an answer that a Company witness gave and give me the objection that you would have asserted had you been permitted to do so.

A. Mr. Brest testified, for example, that I had called him names. I didn't call Mr. Brest any names. It was never raised prior to arbitration at any of the step three meetings or on any documentation that was provided me during that time. I would have objected to that.

Q. Okay. Can you give me another example?

A. I would have objected to Pam Mealy making a statement that she remained in the safety meeting during the time the film was being shown when, in fact, she wasn't.

Q. Okay. Any other objection that you would have made that he didn't make?

A. I would have objected to the fact that Emil Foriska told Chuck and myself to attend the safety movie when, in fact, he didn't.

Plaintiff's Deposition II at 34–36.

This court is aware of no duty on the part of an arbitrator or judge to allow a party, fully represented, to cross examine witnesses himself or to interrupt testimony

because he believes that a witness is lying. Nor do we believe that a union is under a duty to object when an arbitrator does not permit a party to actively participate in the proceedings in this manner. To allow a cause of action to proceed against a union on this basis would subvert the most fundamental principles of courtroom propriety and decorum. The court thus declines plaintiff's request to extend the fair representation cause of action in this manner.

▆ Finally, with regard to the twenty-third allegation, the evidence indicates that counsel for Amweld moved for sequestration of witnesses. Plaintiff's Deposition I at 183. When asked what his view in response was, Hall "didn't suggest sequestering the witnesses," *i.e.,* Hall "was not opposed to having them all stay in the room." *Id.* at 184. Under plaintiff's own version, thus, Hall opposed the sequestration of witnesses.

In essence, plaintiff's complaint under this allegation is that, when Amweld presented its case on the first day of the arbitration proceedings, the Arbitrator allowed it to select a representative who was also a witness to assist counsel.[13] At that point, even though he apparently had the opportunity, Hall did not select an assistant, nor did he object to Amweld's appointment of an assistant. *Id.* at 185. However, when the Union presented its case on the second day of the proceedings, Hall did select an assistant. *Id.* at 186–87. The court believes that, under these circumstances, Hall's delayed action amounts at most to ordinary negligence. To require more would tend to hold union representatives to the standard to which trained lawyers are held. We do not believe that such a result is contemplated by the labor laws. The court, further, is also compelled to note that plaintiff admits that there is nothing an additional Union representative could have done if present during the first day of the proceedings. *Id.* at 187. With no damaging result flowing from the asserted Union misconduct, the claim in allegation twenty-three simply is not actionable.

Before we move on to the second element to be applied in this fair representation suit, the court must address one final aspect of the first element, which aspect has been discussed previously. The Sixth Circuit has held that, as a matter of law, the duty of fair representation is implicated only where an individual or group is treated differently than another individual or group by the Union. *Local 299,* 782 F.2d at 51–52, *see* this court's discussion at 1306, *supra.* Plaintiff's own testimony makes it clear, however, that there exists no evidence in this case of differential treatment by the Union:

Q. In paragraph 69 you claim that the Union's conduct was discriminatory. Do you know what the word "discriminatory" means?

A. Yes.

Q. Does it mean treating one person differently than another person?

A. To the best of my knowledge, that's exactly what it means.

Q. How did Mr. Hall discriminate between you and somebody else?

A. Mr. Hall discriminated against me by not preparing his case for arbitration, questioning the witnesses.

Q. *Do you know how he prepared anybody else's case for arbitration?*

A. *No, I don't.*

Q. So, how can you say that you were treated discriminatorily?

A. Well, to the best of my ability, I answered that, plus the fact that he didn't take any suggestions that I gave him, picked an arbitrator that I didn't want him to pick.

Q. *Do you know that he didn't do those things for anybody else that he has represented?*

A. *I don't know that he did.*

Q. Okay. So, you don't know whether or not you were treated discriminatorily by him, do you?

A. In my opinion, I think I was.

---

**13.** As revealed by his deposition testimony, plaintiff is referring to Pelphrey, Amweld's assistant who was also a witness, when he alleges that the Arbitrator permitted Amweld's "key witness" to remain in the proceedings. Complaint at ¶ 64.

Q. But you don't have any facts upon which to base that thought, do you?

A. I think I answered that question. Plaintiff's Deposition II at 75–77 (emphasis added). Thus, in addition to those reasons already stated, we find as a matter of law that no breach of the duty of fair representation has occurred in this case.

 Even were the court to find evidence of breach of Union duty, it would not appear in any event that the record supports any claim that such a breach contributed to the rendering of an erroneous arbitration decision. Put in another way, the record does not contain sufficient evidence of the second element of this type of fair representation suit. Plaintiff has not alleged, and the evidence fails to indicate, that anything the Union did in this case contributed to the Arbitrator's adverse disposition of plaintiff's case. With regard to the pre-arbitration matters (allegations one through eleven), the Arbitrator addressed plaintiff's complaints about Amweld's alleged misconduct; thus, whether or not the Union raised objections to Amweld in the earlier grievances is irrelevant to the manner in which the Arbitrator ultimately disposed of the case. With regard to the remaining allegations, there is nothing to suggest that the Arbitrator would have decided plaintiff's case differently had the Union acted as plaintiff now demands.

For the foregoing reasons, the court finds that the first and second elements in this fair representation case fail as a matter of law. Plaintiff's suit against the Union must therefore be dismissed. Further, with no viable claim against the Union, plaintiff's § 301 claim against Amweld must also be dismissed as a matter of law. *Black*, 930 F.2d at 510, *supra*. Count One of the complaint is, therefore, dismissed in its entirety.

### C. Cross–Motions For Summary Judgment on Count Two of the Complaint

In Count Two of the complaint, plaintiff avers that Amweld is liable under COBRA for failing "to provide Plaintiff the required notice of continuation coverage, under the UIU Health and Welfare Fund (the Fund) and the insurance program, for continuation of coverage of terminated workers, their spouses and former spouses, and their dependent children ...". Complaint at ¶ 75. In its motion for summary judgment, Amweld contends that it sent proper notification of continuation coverage for plaintiff to the plan administrator, the Fund, as required by COBRA. In his motion for summary judgment, plaintiff argues that the notice of continuation coverage was untimely and that Amweld breached its duty under COBRA of notifying plaintiff of his rights thereunder.

The applicable portions of COBRA provide, in part, as follows:

The plan sponsor of each group health plan shall provide, in accordance with this part, that each qualified beneficiary who would lose coverage under the plan as a result of a qualifying event is entitled, under the plan, to elect, within the election period, continuation coverage under the plan.

29 U.S.C. § 1161(a).

(a) General

In accordance with regulations prescribed by the Secretary—

(1) the group health plan shall provide, at the time of commencement of coverage under the plan, written notice to each covered employee and spouse of the employee (if any) of the rights provided under this subsection,

(2) the employer of an employee under a plan must notify the administrator of a qualifying event described in paragraph (1), (2), (4), or (6) of section 1163 of this title within 30 days (or, in the case of a group health plan which is a multiemployer plan, such longer period of time as may be provided in the terms of the plan) of the date of the qualifying event,

. . . . .

(4) the administrator shall notify—

(A) in the case of a qualifying event described in paragraph (1), (2), (4), or (6) of section 1163 of this title, any qualified beneficiary with respect to

such event, ... of such beneficiary's rights under this subsection.

29 U.S.C. § 1166(a)(1), (2), (4)(A).

For purposes of this part, the term "qualifying event" means, with respect to any covered employee, any of the following events which, but for the continuation coverage required under this part, would result in the loss of coverage of a qualified beneficiary:

. . . . .

(2) The termination (other than by reason of such employee's gross misconduct), or reduction of hours, of the covered employee's employment.

29 U.S.C. § 1163(2). Under these provisions, the employer must notify the plan administrator of a "qualifying event," such as termination, within 30 days of the event. It is then the obligation of the plan administrator to provide notice of continuation rights to the employee.[14]

Amweld submits that the undisputed facts in the record demonstrate that plaintiff was discharged on March 14 and that it sent notice of this qualifying event to the plan administrator, the Fund, on April 9, 1990. Affidavit of Pam Mealy, Amweld Personnel Administrator, at ¶ 3. Thus, according to Amweld, the proper notice was sent within 30 days as required by § 1166(a)(2).

▮ Plaintiff's untimeliness argument is based upon two propositions. First, he contends that a copy of the notice sent by Mealy to the Fund, attached to the Mealy affidavit as Exhibit B, indicates that plaintiff was discharged on February 2, 1990. According to plaintiff, this indisputably establishes as a matter of law that plaintiff was in fact discharged on February 2, 1990, and thus that Amweld's notice to the Fund was 66 days late.

Plaintiff's position is unconvincing. Contrary to what is written on the notice, we find that the undisputed evidence in this case reveals that plaintiff was not discharged until March 14, 1990. As the analysis in earlier portions of this opinion

reveal, February 2 represents not the date of discharge, but rather the date on which plaintiff was first suspended. Moreover, plaintiff *himself* testified on more than one occasion that the date of discharge was March 14. Plaintiff's Deposition I at 20, 88. This testimony is consistent with the great weight of the evidence in this case, *see* discussion *supra*. To now argue that the discharge *indisputably* occurred on February 2, in the face of overwhelming evidence to the contrary and in contravention of his stated position to date, is patently unreasonable. We find that in light of the evidence hereinbefore discussed, the notice sent by Amweld to the Fund indicating that the discharge occurred on February 2 does not amount to more than a "scintilla" of evidence for purposes of Rule 56. *See Street*, 886 F.2d at 1479.

▮ Plaintiff's second ground in support of the argument that the COBRA notice was not timely sent is based upon the fact that Amweld did not send a contribution on behalf of plaintiff to the Fund for April of 1990. Mealy Affidavit at ¶ 3. Plaintiff reasons that, because Amweld discontinued plaintiff's coverage nine days prior to the sending of the notice of his termination to the Fund, the notice was untimely. Underlying this argument, of course, is the proposition that, because Amweld ceased sending contributions to the Fund prior to the sending of the notice, plaintiff was precluded from thereafter electing continuation coverage under COBRA.

Plaintiff cites to no authority in support of the proposition that an employer's COBRA notice is untimely unless it is sent before the employer ceases making contributions on behalf of the employee. Nor are we able to locate authority holding that an employee is no longer eligible for continuation coverage if his employer has stopped making contributions prior to the date notice is sent to the Fund. Certainly, nothing in COBRA itself mandates this, and a reading of the statute actually evinces a contrary result. The statute defines "covered employee" as "an individual who

---

**14.** The term "qualified beneficiary" in § 1166(4)(A) includes "covered employees" when the qualifying event is a termination under § 1163(2). 29 U.S.C. § 1167(3)(B).

is (*or was*) provided coverage under a group health plan ..." 29 U.S.C. § 1167(2) (emphasis added). Clearly, an employee such as plaintiff who is terminated and for whom no contribution is thereafter sent by his employer is still a "covered employee" and thus entitled to the available continuation coverage. Thus, the fact that Amweld did not send a contribution to the Fund on behalf of plaintiff for the month of April 1990 in no way affected plaintiff's rights to elect to receive continuation coverage. Plaintiff still had the right to elect such coverage, so long as he was so notified by the plan administrator. For this reason, plaintiff's argument that Amweld's notice to the Fund was untimely in that it occurred subsequent to the date on which contributions discontinued lacks merit.

Plaintiff proffers a second argument in support of his motion for summary judgment. Contrary to the express provisions of § 1166, plaintiff contends that an employer is obligated along with the plan administrator to send notice to the employee of his COBRA rights when a qualifying event has occurred. The court notes, initially, that this argument is contrary to the express language of the statute, 29 U.S.C. § 1166(a)(2), (4)(A). In addition, the case cited by plaintiff, *Kidder v. H & B Marine, Inc.*, 734 F.Supp. 724 (E.D.La.1990), *aff'd in part, rev'd in part* 932 F.2d 347 (5th Cir.1991), offers no support for this position. In that case, the plaintiff employee brought a COBRA action against his former employer, group insurance trust, and group health plan underwriter, alleging that these defendants failed to provide him with continuation coverage under the plan. The court found for the employee against all three defendants.

The court's finding of liability with regard to the employer was based upon three subsections of COBRA. First, the court found the employer liable under § 1161(a) because it was a "plan sponsor" who failed to provide continuation coverage. *Kidder*, 734 F.Supp. at 729. Next, the employer was liable under § 1166(a)(1) because, at the commencement of the plan, it did not provide notice of COBRA rights as was its duty as a group health plan participant. *Id.* 734 F.Supp. at 730. Finally, the court found that the employer was remiss in its duty of notifying the plan administrator of the qualifying event within 30 days of its occurrence. § 1166(a)(2). *Id.*, 734 F.Supp. at 731. The court held the employer liable for 75% of the award and the trust and insurer liable for 25%, in accordance with their relative degrees of responsibility. On appeal, the Court of Appeals for the Fifth Circuit held that the employer was liable for the entire damages award because it did not fulfill its threshold duty of notifying the plan administrator of the qualifying event, § 1166(a)(2). As such, the duty on the part of the other defendants never took effect. 932 F.2d at 356–57.

A comparison of *Kidder* with the case at bar establishes several important differences. First and foremost, as discussed above, the undisputed evidence in this case reveals that Amweld met its obligations under § 1166(a)(2) by sending notice of plaintiff's termination to the plan administrator within 30 days. In *Kidder*, the employer had failed in this respect, and this was the primary reason it was found wholly liable.

As the court in *Kidder* held, where the employer complies with § 1166(a)(2), it is then the obligation of the plan administrator to notify the employee of his COBRA rights. *Id.*, 734 F.Supp. at 731. The court does not believe, as plaintiff suggests, that *Kidder* can be interpreted as holding that an employer who fulfills its obligation under § 1161(a)(2) can be held liable for the plan administrator's subsequent lack of compliance with § 1166(a)(4). Nor do we believe that *Kidder* mandates that an employer be held liable under § 1161(a) for failure to provide continuation where it has complied with § 1166(a)(2). Neither COBRA nor the *Kidder* court's interpretation can be stretched this far.

Finally, the court does agree with *Kidder* that § 1166(a)(1) requires that the employer, as a participant in the group health plan, provide written notice of COBRA continuation coverage to the employee at the commencement of the plan. However, Am-

weld's duty in this regard is not implicated in this case. Plaintiff has not alleged that Amweld has violated § 1166(a)(1) by failing to provide notice of rights to coverage at the *commencement of the plan*. Rather, plaintiff's sole argument is that Amweld has violated § 1166(a)(2) by failing to provide notice to plaintiff and the plan administrator of the qualifying event within the time period prescribed. Plaintiff's Motion for Summary Judgment at 1–2.[15] As we have held, Amweld did provide the required notice of the qualifying event to the plan administrator pursuant to § 1166(a)(2), and did not have the concomitant duty toward plaintiff under § 1166(a)(4).

For all of these reasons, then, this case differs substantially from the situation in *Kidder*. In *Kidder*, the court found that the employer had violated both §§ 1166(a)(1) and 1166(a)(2). For this reason, it was liable under § 1161(a) for failing to provide continuation coverage to plaintiff. Here, by contrast, there is no allegation that § 1166(a)(1) has been violated, and the uncontroverted evidence establishes that Amweld has complied with § 1166(a)(2). Thus, as a matter of law, Amweld cannot be held liable under § 1161(a) for failing to provide continuation coverage.

### III. CONCLUSION

For the foregoing reasons, the motions for summary judgment filed by the Union (docket no. 18) and by Amweld (docket no. 16) are granted. The motions for summary judgment filed by plaintiff (docket nos. 28, 30) are denied. This cause is thus hereby terminated in its entirety.

IT IS SO ORDERED.

---

**15.** We note that plaintiff in his complaint alleges that Amweld failed to provide notice to plaintiff of continuation coverage in violation of § 1161. Section 1161 is not a notice section, however, as even plaintiff's reading of *Kidder* makes clear. Moreover, in any event, plaintiff's motion for summary judgment only cites § 1166(a)(2) as the subsection violated by Amweld.